Filed 11/3/25  In re P.M. CA4/2
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re P.M., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E082577 |
| Plaintiff and Respondent, | (Super. Ct. No. J286868) |
| v. | OPINION |
| P.R., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Annemarie G.

Pace, Judge.  Affirmed.

Sebastien Akarmann and Christine Johnson, under appointment by the Court of

Appeal, for Defendant and Appellant P.R.

Tom Bunton, County Counsel, Joseph R. Barrell, Deputy County Counsel, for

Plaintiff and Respondent.

1

## I.

## INTRODUCTION

P.R. (Mother) appeals from the juvenile court's order terminating parental rights as to her now five -year-old daughter P.M. (Welf. & Inst. Code,[1] § 366.26). Mother contends that the juvenile court and the San Bernardino County Children and Family Services (CFS) failed to comply with the duty of inquiry under the Indian Child Welfare Act of 1978 (ICWA)[2] (25 U.S.C. § 1901 et seq.) and related state law, and therefore substantial evidence did not support the court's finding ICWA did not apply.[3] In an unpublished decision, we affirmed the order terminating parental rights on the ground that there was no need for an extended-family initial inquiry under section 224.2, subdivision (b), because P.M. was taken into protective custody pursuant to a warrant under section 340, and *also* because we found any error to be harmless. (*In re P.M.* (June 13, 2024, E082577) [nonpub. opn.].)

The Supreme Court granted review on August 21, 2024, and deferred further action on the matter pending consideration and disposition of a related issue in *In re Ja.O.* (2023) 91 Cal.App.5th 672, review granted July 26, 2023, S280572, and pending

---

[1] All future statutory references are to the Welfare and Institutions Code.

[2] "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

[3] F.M. (Father) is not a party to this appeal.

2

finality of *In re Dezi C.* (2022) 79 Ca1.App.5th 769, review granted Sept. 21, 2022, S275578.

On October 1, 2025, the Supreme Court transferred the matter back to this court with directions to vacate our opinion and reconsider the cause in light of *In re Ja.O.* (2025) 18 Cal.5th 271 (*Ja.O.*). We vacated our opinion and directed the parties to file supplemental briefs limited to matters arising after this court's previous opinion was filed.{ACCMS 10/2/25 Order}

The parties thereafter submitted their supplemental briefs to address issues related to CFS's efforts to inquire of Father's extended relatives under the ICWA in light of the Supreme Court's decision in *Ja.O.*, *supra*, 18 Cal.5th 271. In her supplemental brief, Mother argues because the California Supreme Court determined that Assembly Bill No. 81 clarified, and did not change the law, section 224.2 applies to this case, and because CFS failed to conduct an extended-family inquiry, the matter should be conditionally reversed and remanded for ICWA compliance. In their supplemental brief, CFS agrees that pursuant to Assembly Bill No. 81 and the Supreme Court's decision in *Ja.O.*, *supra*, 18 Cal.5th 271, section 224.2 applies to this case. Nonetheless, CFS argues this court should affirm the ICWA findings and orders under *In re Dezi C.* (2024) 16 Cal.5th 1112 (*Dezi C.*) because the juvenile court's finding ICWA did not apply was supported by sufficient evidence and a well-developed record based on the inquires conducted by CFS and the court.

3

We agree with the parties that section 224.2 applies to this case and affirm the juvenile court's ICWA findings and orders under *Dezi C.*, *supra*, 16 Cal.5th 1112.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *General Background*

This case involves Mother's sixth child. Mother has a prior history with child protective services involving five of her other children due to issues with substance abuse and domestic violence in the home. Prior to this case, three of Mother's children were adopted: one child in 2017, another in 2018, and another in February 2019. Two of Mother's other children were provided with Kin-Gap services in December 2019.

Ten months after the dependency cases in December 2019 were closed, Mother again came to the attention of CFS in October 2020, after an immediate response referral was received with allegations of domestic violence between Mother and Father and Father and paternal uncle A.R. On October 2, 2020, CFS and law enforcement made contact with Mother, the maternal great-grandmother and then nine-month-old P.M. at Mother's residence while they were seated in a vehicle. After some coaxing, Mother eventually exited the vehicle and came into her residence for an interview. During the interview, Mother stepped away and then left the home with the maternal great-grandmother and the child in the vehicle.

The social worker and a deputy sheriff located the maternal great-grandmother at her home. The maternal great-grandmother informed them that Mother had exited the

4

vehicle with the child at an intersection and that she did not know their whereabouts. While at the home, the social worker spoke to a maternal great-uncle who confirmed that Mother lived an unstable lifestyle. He did not believe the child was safe in Mother's care due to her dangerous, criminal, and substance abuse lifestyle.

On October 2, 2020, a detention warrant was obtained but Mother and the child could not be located. Father was also unable to be located.

On October 6, 2020, a petition was filed on behalf of the child pursuant to section 300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). A first amended petition was later filed to add allegations against Father. At the detention hearing on this same date, the juvenile court formally detained the child from parental custody and granted CFS a protective custody warrant for the child. Neither Mother nor Father were present in court.

Mother and the child were eventually located at a motel in Redlands. Due to outstanding criminal warrants, Mother was arrested and the child was taken into protective custody. Father's whereabouts remained unknown.

The juvenile court took jurisdiction of the instant matter on March 24, 2021. The court found true the allegations in the first amended petition, declared the child a dependent of the court, and provided the parents with reunification services. The child was placed in the relative home of maternal cousin C.C.

Father's services were terminated at the six-month review hearing in September 2021. Although Mother's prognosis was guarded due to her missed drug tests, her

5

services were continued for an additional six months. However, by the 12-month review hearing in March 2022, Mother continued to be noncompliant with her drug testing and had not participated in any outpatient or inpatient drug treatment programs. The juvenile court thus terminated Mother's services and set a section 366.26 hearing to establish a permanent plan for the child.

The child initially remained in the home of maternal cousin C.C. However, by the 12-month review hearing, after a bruise was found on the child's forehead and following an investigation by CFS, the child was moved to another foster home. At the March 2022 12-month review hearing, the juvenile court authorized an Interstate Compact on the Placement of Children (ICPC) with Texas for placement of the child with an adult maternal cousin, T.A.-B. and her husband, who were willing to adopt the child. The child was placed with T.A.-B. in Texas on September 14, 2022.

CFS recommended the juvenile court terminate parental rights. The child remained in the home of T.A-B. and her husband M.B. She was healthy and developmentally on track. She had adapted well to the home and was bonded to her caregivers and other family members.

The section 366.26 hearing was held on November 2, 2023. The juvenile court found the child to be adoptable and terminated parental rights. Mother timely appealed.

B. *ICWA Background*

ICWA was found not to apply in Mother's prior cases. In this case, Mother denied having any Indian ancestry orally when inquired by the juvenile court and in her ICWA-020 Parental Notification of Indian Status form (ICWA-020). Father also denied Indian ancestry when inquired by the court and in his "Family Find and ICWA Inquiry" form and ICWA-020 form. Father's family find and ICWA inquiry form listed maternal cousin T.Q. (also referred to as T.C.), paternal uncle J.R., paternal great aunt B.C., and paternal cousin S.P. as possible placements and contactable family members.

CFS identified, contacted or attempted to contact numerous maternal and paternal relatives regarding ICWA throughout the pendency of the case. Specifically, maternal great uncle R.R. denied Indian ancestry in the ICWA-010 form attached to the original petition. Maternal relative R.R. (adult daughter of maternal cousin C.C.) also denied Indian ancestry. Maternal relatives Ms. A. and T.A-B. denied any Indian ancestry. T.A-B.'s husband M.B. also denied any Indian ancestry. The child's adult sibling M.L. denied Indian ancestry as well. In addition, I.M., who was unrelated to the child, but had a child with paternal uncle A.R., denied Indian ancestry and noted paternal uncle A.R. was incarcerated at "WVDC."

Maternal grandfather's whereabouts were unknown. He was somewhere in San Bernardino and no contact information was provided. Paternal grandmother C.C.'s whereabouts were also unknown. It was reported that the paternal grandmother was homeless and that she was in San Bernardino. The phone numbers for paternal uncle

7

J.R., paternal great aunt B., and paternal cousin S.P. were no longer in service. CFS did not have contact information for maternal cousin T.C., maternal cousin Bianca, or paternal uncle A.R. CFS attempted to contact Father to get updated information, but he did not respond. Mother had moved to Arkansas, did not provide accurate updated contact information, and was intermittently responsive to any efforts to set up an interview which was ultimately unsuccessful. Maternal grandmother, maternal great grandmother, maternal great grandfather, maternal great-great grandfather, and maternal great-great grandmother were all deceased.

In August 2023, CFS contacted maternal great uncle R.G.R. and obtained the contact information for maternal great uncle L.R. CFS contacted maternal uncle L.R., who claimed that, according to the maternal great-great grandmother, the family had Indian ancestry through an unidentified tribe. L.R., however, stated that he was "unsure" about this information and that he was never provided with the name of the tribe. CFS sent inquiry letters to the national office and Pacific regional office of the Bureau of Indian Affairs (BIA) with information about the family in September and October 2023, but by the section 366.26 hearing neither had responded. On November 2, 2023, at the section 366.26 hearing, the juvenile court found that CFS had conducted a sufficient ICWA inquiry and concluded ICWA did not apply to the proceedings.

8

III.

DISCUSSION

Mother challenges the order terminating parental rights on the grounds that the juvenile court and CFS failed to comply with the inquiry requirements of ICWA and related California law. Relying on section 224.2, subdivision (b) and California Rules of Court, rule 5.481, Mother specifically asserts that CFS never inquired with the maternal cousin/former caregiver C.C., maternal cousin T.C., and paternal uncle A.R., who was incarcerated at West Valley Detention Center, as to their Indian ancestry. She further asserts that maternal great uncle L.R.'s claim that, according to maternal great-great grandmother, the family had Indian ancestry triggered a duty of further inquiry pursuant to section 224.2, subdivision (e). CFS argues this court should affirm the ICWA findings and orders under *Dezi C.*, *supra*, 16 Cal.5th 1112 because the juvenile court's finding ICWA did not apply was supported by sufficient evidence and a well-developed record based on the inquiries conducted by CFS and the court.

A. *Legal Framework*

"We must uphold the court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.) On undisputed facts, the appellate court makes an independent determination whether ICWA's requirements have been satisfied. (*In re D.F.* (2020) 55 Cal.App.5th 558, 565.)

9

Congress enacted ICWA "'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture.'" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7-8; see 25 U.S.C. § 1902.) Both ICWA and state law define an "'Indian child'" as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definition].) ICWA establishes minimum federal standards that a state court must follow before removing Indian children from their families. (*In re T.G.* (2020) 58 Cal.App.5th 275, 287; see, e.g., 25 C.F.R. § 23.107 (2023); § 224.2; Cal. Rules of Court, rule 5.481.) California law implementing ICWA also imposes requirements to protect the rights of Indian children, their families, and their tribes. (See §§ 224-224.6; *In re Abbigail A.* (2016) 1 Cal.5th 83, 91 ["persistent noncompliance with ICWA led the Legislature in 2006 to 'incorporate[] ICWA's requirements into California statutory law'"].)

"'"'Federal regulations implementing ICWA . . . require that state courts "ask each participant in an emergency or voluntary or involuntary child-custody proceeding whether the participant knows or has reason to know that the child is an Indian child." [Citation.] The court must also "instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian

10

child.' " ' " [Citations.] 'State law, however, more broadly imposes on social services agencies and juvenile courts (but not parents) an "affirmative and continuing duty to inquire" whether a child in the dependency proceeding "is or may be an Indian child." ' " (*In re J.C.* (2022) 77 Cal.App.5th 70, 77.)

Under California law, the juvenile court and county child welfare department have "an affirmative and continuing duty to inquire" whether a child subject to a section 300 petition may be an Indian child. (§ 224.2, subd. (a); see *In re D.F.*, *supra*, 55 Cal.App.5th at p. 566; *In re Ricky R.* (2022) 82 Cal.App.5th 671, 678.) "This continuing duty can be divided into three phases: the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice." (*In re D.F.*, *supra*, at p. 566.) This case does not concern the duty of further inquiry, which arises only if the court or the department has "reason to believe that an Indian child is involved" (§ 224.2, subd. (e)), or the duty to provide formal ICWA notice, which occurs only if the court or the department has reason to know that an Indian child is involved (25 C.F.R. § 23.107(c)(1)-(6); § 224.2, subd. (d)(1)-(6)).

The duty of initial inquiry begins with the initial contact when CFS must ask "the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) Part of the initial inquiry also includes requiring each party to complete California Judicial Council form ICWA-020, Parental Notification of Indian Status. (Cal. Rules of Court, rule 5.481(a)(2)(C).)

11

The initial duty applies in every dependency. (*In re J.S.* (2021) 62 Cal.App.5th 678, 686; see § 224.2, subd. (b)(1).) The initial duty expands under subdivision (b)(2) of section 224.2, when a child is removed from their home. Under that provision, if a child is taken into custody, the department's obligation "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled." (§ 224.2, subd. (b)(2).) Extended family members include adults who are the child's stepparents, grandparents, aunts, uncles, brothers, sisters, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).)

Effective September 2024, Assembly Bill No. 81 (2023-2024 Reg. Sess.) (Stats. 2024, ch.656) amended section 224.2 to clarify that this duty applies whenever "a child is placed into the temporary custody of a county probation department pursuant to Section 307, or received and maintained in temporary custody of a county welfare department pursuant to paragraph (1) of subdivision (a) of Section 306, or taken into or maintained in the temporary custody of a county welfare department pursuant to paragraph (2) of subdivision (a) of Section 306, or if they were initially taken into protective custody pursuant to a warrant described in Section 340."[4] (§ 224.2,

---

[4] At the time of initial briefing, former section 224.2, subdivision (b) stated: "If a child is placed into the temporary custody of a county welfare department pursuant to Section 306 or county probation department pursuant to Section 307, the county welfare department or county probation department has a duty to inquire whether that child is an Indian child." (Former § 224.2, subd. (b)(2) (Stats. 2018, ch. 833, § 5).)

12

subd. (b)(2); Assembly Bill No. 81 (2023-2024 Reg. Sess.); see, e.g., Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assembly Bill No. 81 (2023-2024 Reg. Sess.) as amended Aug. 19, 2024, p. 5 [the bill "[c]larifies the timing, duration, and scope of a county department's, and a court's, duty to inquire whether a child is or may be an Indian child"].)

Our Supreme Court recently held that Assembly Bill No. 81 clarified, rather than changed, the law, and therefore this duty applies in all cases, including cases that pre-date the enactment of Assembly Bill No. 81. (See *Ja.O.*, *supra*, 18 Cal.5th at p. 335; *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 922 ["A statute that merely clarifies, rather than changes, existing law is properly applied to transactions predating its enactment."].) Assembly Bill No. 81 "amended former section 224.2 to add language specifying that the extended-family inquiry duty applies whenever a child is placed into a county welfare department's temporary custody, regardless of how the child is removed from the home." (*Ja.O.*, *supra*, 18 Cal.5th at pp. 277, 291.) Hence, Assembly Bill No. 81 amended the language of the statute now to explicitly require extended-family inquiry regardless of the manner in which the child is removed from parental custody and placed into protective custody. (*Ibid*.)

Based on the foregoing, we agree with the parties that section 224.2, subdivision (b) applies to this case. Nonetheless, we find sufficient evidence in the record to support the juvenile court's findings that ICWA did not apply to this case.

B. *Juvenile Court's ICWA Findings*

The juvenile court may find ICWA does not apply to a child's proceeding if it finds CFS's "inquiry and due diligence were 'proper and adequate,' and the resulting record provided no reason to know the child is an Indian child." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134; § 224.2, subd. (i)(2).)  The juvenile court's finding that ICWA does not apply thus " ' "implies that . . . social workers and the court did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry." ' " (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 401.)

As previously noted, we generally review the juvenile court's factual finding that ICWA does not apply for substantial evidence. (§ 224.2, subd. (i)(2) [juvenile court's finding that ICWA does not apply to the proceedings is "subject to reversal based on sufficiency of the evidence"]; see also *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1004-1005 (*Ezequiel G.*) [reviewing juvenile court's finding that it had no reason to know a child is an Indian child for substantial evidence but reviewing decision that ICWA inquiry was adequate for abuse of discretion], disapproved on another ground in *Dezi C.*, *supra*, 16 Cal.5th at p. 1152, fn. 18; *Dezi C.*, at p. 1134 [declining to decide applicable standard of review].)

"[T]he juvenile court's fact-specific determination that an inquiry is adequate, proper, and duly diligent is 'a quintessentially discretionary function' [citation] subject to a deferential standard of review." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141, quoting *Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1005.)  " 'On a well-developed record, the court

has relatively broad discretion to determine whether the agency's inquiry was proper, adequate, and duly diligent on the specific facts of the case. However, the less developed the record, the more limited that discretion necessarily becomes.' " (*Kenneth D.*, *supra*, 16 Cal.5th at pp. 1101-1102.) Our high court thus has held, if "a juvenile court's findings that an inquiry was adequate and proper and ICWA does not apply are found to be supported by sufficient evidence and record documentation as required by California law [citation], there is no error and conditional reversal would not be warranted even if the agency did not inquire of everyone who has an interest in the child." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1141) This rule only applies, however, when there is a well-developed record, and " ' "the less developed the record, the more limited that discretion necessarily becomes." ' " (*Ibid*.) "If a child welfare agency fails to obtain meaningful information or pursue meaningful avenues of inquiry—by, for example, failing to discover that a parent was adopted, or failing to inquire further after a parent identified an extended family member with more information about the child's potential Indian ancestry—those facts would be relevant to whether the initial Cal-ICWA inquiry is adequate." (*Id.* at p. 1151.)

Here, we are not reviewing a fact that comes through a juvenile court's resolution of an evidentiary conflict, but the juvenile court's finding that the department's "inquiry and due diligence were 'proper and adequate.' " (*Dezi C.*, *supra*, 16 Cal.5th at p. 1134.) We are thus "not concerned with the outcome" (*id*. at p. 1144) as to the likelihood of whether the child is Indian and do not limit our review to "[e]nforcing the requirement of an adequate inquiry only in cases in which the record affirmatively demonstrates a reason

15

to believe the child is an Indian child." (*Id*. at p. 1147.)  Instead, we are "ensuring that tribal heritage is acknowledged and inquired about in dependency cases." (*Id.* at p. 1148.)  This mission requires that we engage in a searching review to protect compelling and legally protected tribal interests.  (See *id.* at p. 1147.)  Yet the deferential standard requires that we not find error just because the inquiry was not flawless.

Finally, if our review reveals "error resulting in an inadequate initial Cal-ICWA inquiry," then we must order "conditional reversal with directions for the child welfare agency to comply with the inquiry requirement of section 224.2, document its inquiry in compliance with [California Rules of Court], rule 5.481(a)(5), and when necessary, comply with the notice provision of section 224.3." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1136.)

Mother claims that several extended family members, such as maternal cousins C.C. and T.C., maternal great uncles R.G.R. and L.R., and paternal uncle A.R., were not interviewed as to their Native American ancestry.  Substantial evidence in the record before the juvenile court supports its finding that ICWA did not apply to P.M.  ICWA was found not to apply in Mother's prior cases.  Mother and Father each filed ICWA-020 forms denying Indian ancestry—which the court confirmed at their initial appearances.  Father also denied Indian ancestry on his "Family Find and ICWA Inquiry" form.  Maternal great uncle, R.R. (also referred to as R.G.R.) denied Native American ancestry

16

in the ICWA-010 attached to the original petition.[5]  Maternal relative R.R., the daughter of maternal cousin C.C., denied Indian ancestry.  P.M.'s adult sibling, M.L. denied Indian ancestry.  I.M. who was unrelated to P.M. but had a child with paternal uncle A.R. denied Indian ancestry.  Maternal relatives Ms. A. and T.A-B. denied any Indian ancestry.  T.A-B.'s husband M.B. denied any Indian ancestry.  Nothing in the record calls into question the credibility of these statements.

Father's family find form listed maternal cousin T.Q. (also referred to as T.C.), paternal uncle J.R., paternal great aunt B.C., and paternal cousin S.P. as possible placements and contactable family members.  The phone numbers for paternal uncle J.R., paternal great aunt B.C., and paternal cousin S.P. were no longer in service.  No contact information was listed for maternal cousin T.C. on the family find form, and CFS was never provided with contact information for maternal cousin T.C., maternal cousin Bianca, or paternal uncle A.R.  I.M. indicated that A.R. was possibly incarcerated at "WVDC" (West Valley Detention Center).  CFS made significant efforts to contact T.C. and A.R. without success.

Although maternal cousin C.C. was not contacted, it did not materially impact the inquiry.  Not every relative needs to be interviewed.  (*Dezi C.*, *supra*, 16 Cal.5th at

---

[5]  We note that Mr. C., T.C., and T.Q. appear to be the same person–a maternal cousin.  In addition, the record indicates that maternal great uncles R.G.R. and L.R. were contacted regarding their Native American ancestry and that L.R. claimed possible Indian heritage through the maternal great-great grandmother but that he was "unsure" and did not know the tribe.  It also appears that maternal great uncle "R.R." is the same person as "R.G.R."  Great uncles are not extended relatives as defined by the ICWA.  Nonetheless, maternal uncle R.R. denied Indian ancestry in the ICWA-010 form attached to the original petition.

p. 1141.)  Further, maternal cousin C.C. had adopted a sibling and no sibling was found to be an Indian child.  And maternal cousin C.C.'s daughter R.R. was interviewed and R.R. denied Indian ancestry.  It was reasonable to conclude that the absence of maternal cousin C.C.'s inquiry would have minimal impact on the propriety and quality of CFS's inquiry.

CFS attempted to reach Father to get updated information, but he did not respond. Mother had moved to Arkansas, did not provide accurate updated contact information and was only intermittently responsive to any efforts to set up an interview which was ultimately unsuccessful.  Maternal grandmother, maternal great grandmother, maternal great grandfather, maternal great-great grandfather, and maternal great-great grandmother were all deceased.  Maternal grandfather's whereabouts were unknown.  He was somewhere in San Bernardino and no contact information was provided.  Paternal grandmother C.C.'s whereabouts were also unknown.  It was reported that the paternal grandmother was homeless and that she was in San Bernardino.

In addition, Indian ancestry was not at issue in Mother's prior dependency cases. Given the repeated significance of the issue to her parental rights, we expect Mother would have asked her relatives with whom she had contact about Indian heritage.  This is also true as to Father.  However, after multiple prior dependency cases, Mother and Father still "have no Indian ancestry as far as [they] know."

In August 2023, CFS contacted maternal great uncle R.G.R. and obtained the contact information for maternal great uncle L.R.  CFS contacted maternal uncle L.R.,

18

who claimed that, according to the maternal great-great grandmother, the family had Indian ancestry through an unidentified tribe. L.R., however, stated that he was "unsure" about this information and that he was never provided with the name of the tribe. Maternal great uncle L.R.'s statement that maternal great-great grandmother told him that the family had Indian ancestry but that he was "unsure" was insufficient to trigger further inquiry under section 224.2, subdivision (e). A duty of further inquiry arises when the social service agency or the juvenile court has "reason to believe" the proceedings involve an Indian child but "does not have sufficient information to determine that there is reason to know that the child is an Indian child." (§ 224.2, subd. (e).) As clarified by the Legislature, a "reason to believe" exists when the court or the social service agency "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).)

In *In re I.F.* (2022) 77 Cal.App.5th 152 is instructive. In that case, the mother claimed she had been told by the maternal grandfather (her father) that she had Indian ancestry through the child's maternal great-grandfather, and the child's maternal grandfather confirmed that his father told him the family had Indian ancestry in Minnesota. (*Id*. at pp. 157, 159-160.) Under these circumstances, the appellate court found that the duty of further inquiry was triggered based upon a "reason to believe" the children were Indian children. (*Id*. at p. 164.) Therefore, upon remand the department was required to gather biological information related to the maternal great-grandfather

19

and provide the information to the BIA and the federally recognized tribes in Minnesota. (*Id.* at p. 166.)

In this case, there was no such evidence. L.R. never indicated a tribe or a location of a tribe. Moreover, L.R. further stated that he was "unsure" whether the family had Native American ancestry. We disagree with Mother's appellate counsel's interpretation of L.R.'s statements to the social worker concerning the family's Indian ancestry. During oral argument, Mother's appellate counsel appeared to argue that L.R. was "sure" about the maternal great great-grandmother's claim of Native American ancestry, but "unsure" as to what tribe. The record specifically states that L.R. "was told by the maternal great great grandmother, [P.R.,]" "that the family had Native American Ancestry (tribe unknown), however, he further stated that he is unsure." Our interpretation of L.R.'s statements is that L.R. was "unsure" as to the maternal great great-grandmother's claim of Native American ancestry, as well as the tribe being unknown. The information that the juvenile court received was, at best, speculative family folklore and insufficient to trigger further inquiry.

In any event, CFS continued to inquire of both paternal and maternal relatives concerning the child's Native American ancestry and sent ICWA inquiry letters to the BIA. The required further inquiry includes interviewing the parents and extended family members to gather the information necessary for an ICWA notice, contacting the BIA and State Department of Social Services to gather the names and contact information of the pertinent tribes, contacting the tribes, and contacting any other person who may

20

reasonably be expected to have information regarding the child's membership status or eligibility. (§ 224.2, subd. (e)(2)(A)-(C).) CFS sent inquiry letters to the national office and Pacific regional office of the BIA with information about the family in September and October 2023, but by the section 366.26 hearing neither had responded.

There is no evidence here that any living relatives with knowledge of Mother's possible Indian ancestry were available for CFS to interview. The maternal great-great grandmother was deceased, as was the maternal grandmother, the maternal great grandmother, the maternal great grandfather, and the maternal great-great grandfather. There were no other family members identified that could provide additional information. CFS had already inquired of at least nine relatives with all, except L.R.'s speculative statement, denying Indian ancestry. Certainly, paternal uncle A.R. would not have such information, even if he was readily available to be contacted while in custody at WVDC. Moreover, there was no tribe to contact because no tribe was identified. Nevertheless, CFS sent letters by certified mail to both the national office and Pacific regional office of the BIA on September 13, 2023, and October 20, 2023, respectively. The letters included the known information about the maternal great-great grandmother, the parents, and the child. Given that all persons that had information about maternal great uncle L.R.'s claim of possible Indian ancestry were deceased, CFS had no additional leads to pursue.

True, CFS did not ask every relative about the child's possible Indian ancestry. However, our high court in *Dezi C.* clarified that section 224.2 does not require CFS to locate and interview " 'every possible extended family member,' but only those who are

21

'["]reasonably available to help the agency with its investigation.["]'" (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140.) The *Dezi C.* court explained, " '[t]he operative concept is those people who are reasonably available to help the agency with its investigation into whether the child has any potential Indian ancestry should be asked.' " (*Ibid.*) We conclude that is what happened here.

CFS's inquiry included responses from the parents and several relatives or people with an interest in the child that denied Indian ancestry. Additional documentation of the investigation showed that the whereabouts of some relatives where unknown, contact information was unknown or inaccurate for others, and others were deceased and therefore could not provide any additional information. Letters were sent to the BIA. CFS made extensive efforts to determine whether P.M. had Indian ancestry. In light of these efforts, the inability or failure to contact maternal cousin/former caregiver C.C., maternal cousin T.C., or paternal uncle A.R. did not materially impact the inquiry or the reliability of the record or undermine the ICWA inquiry particularly when not every person with an interest in the child must be interviewed. The extensive efforts and numerous denials of Indian ancestry provided evidence of a duly diligent, proper, and adequate inquiry. The resulting, reliable, record provided no reason to know the child was an Indian child.

Nothing in the record suggests maternal cousins C.C. and T.C., or paternal uncle A.R. would have had more or different information about the family's Indian ancestry than what the parents and other relatives already had provided. Thus, the juvenile court

22

reasonably could conclude there was no need for CFS to "duplicate inquiry efforts" by asking the maternal cousins or paternal uncle about ICWA. (*In re C.R.* (2025) 112 Cal.App.5th 793, 802.) "[T]he focus of the court's analysis should not be on the number of individuals interviewed, but on whether the agency's . . . inquiry has yielded reliable information about a child's possible tribal affiliation." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1009.) Moreover, our high court has made clear that reversal is not "require[d] . . . in all cases in which every possible extended family member has not been asked about the child's Indian ancestry." (*Dezi C.*, *supra*, 16 Cal.5th at p. 1140; see *id.* at p. 1141 [declining "to decide what constitutes an adequate and proper inquiry necessary to satisfy section 224.2"].) CFS's " 'obligation [was] only one of inquiry and not an absolute duty to ascertain or refute Native American ancestry.' " (*Id.* at p. 1143.) Based on the record evidence before it, the juvenile court reasonably could find the parents' and extended family relative's consistent denials of Indian ancestry were reliable indicators that P.M. had no Indian ancestry through either Father's or Mother's family.

P.M. was only nine months old when CFS took her into protective custody five years ago. She now has spent most of her young life outside of her parents' care. Substantial evidence supports a finding that Mother's and Father's repeated denials of Indian ancestry, along with denials made by maternal and paternal relatives' confirmation that no Indian ancestry existed within their families, with the exception of speculative information provided by L.R., "reliably answered" the question of whether the child was an Indian child. (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1009.) Accordingly, we

23

conclude the juvenile court did not abuse its discretion in finding CFS's ICWA inquiry of P.M.'s parents and the available paternal and maternal relatives was proper and adequate under section 224.2 and that ICWA did not apply.  We can see no reason why this child should have to wait a moment longer for the stability and permanency adoption by her maternal cousin T.A.-B. and her husband M.B. will provide.

## IV.

## DISPOSITION

The juvenile court's order terminating parental rights over P.M. is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON

J.

We concur:


McKinster

Acting P. J.


FIELDS

J.

24